Good morning, your honors. My name is Tony Gallagher. I am the federal defender for the District of Montana, and I have the pleasure of representing Javier Dolores Gonzalez-Diaz. Your honors, if the court please, I am going to address the, what I'm going to term the Ambrose-Ambrose issue, since it is the most difficult mountain I must climb this morning. It didn't have that name when you tried the case, but it got the name soon thereafter. Yes, your honor, and that was probably an unfortunate circumstance for me that was decided after trial but before sentencing, and I have to first address the fact that certainly I conceded at the time of sentencing that Ambrose-Ambrose and the unpublished case that the government referred to in its brief, Avila-Rivera, certainly are adverse to my interest, but I don't think they're necessarily decisive. Your honors, governments have forms, and those forms mean something. Governments don't issue forms, and they issue forms for everything from the ridiculous to the sublime, but those forms mean something. Neither in Ambrose-Ambrose or Avila-Rivera was there a entry form. And in this case, Mr. Gonzalez-Diaz, which issued an entry form for the very limited purpose of investigating his asylum claim, the BSO, the border security officer for the Canadian authorities, did in fact issue that form to Mr. Gonzalez-Diaz, who was then transported from the border to a holding facility for the RCMP, where the next morning it was determined that he would not be held on that entry form any further and would then be transported to another border facility in the United States, not the one from which he crossed. Can I ask a question? Please. As part of that. I think the reference, I don't know if it's in the actual official documentation, but I thought the term that was used that he was excluded from Canada, is that what they decided? That's what they decided, that he was excluded from Canada. Okay. Now, if he were coming across the border from Canada into the United States and he were deemed excluded, would the legal friction, as it were, the legal status be that he had never entered the United States? Well, Your Honor, you know, we deal with a number of entry terms. Of course, the charge for which Mr. Gonzalez-Diaz was convicted was illegal reentry into the United States. You're not answering my question. My question is, if somebody is intercepted at the border and is excluded after questioning and the like, are they treated as a matter of status as having not entered the United States, even if they were physically across the border in a United States facility? That is true. Okay. I don't see any reference in the briefing to Canadian law. Does Canadian law, to your knowledge, treat persons like that in the same manner? Your Honor, there is no reference to Canadian law because there was no testimony during the course of the trial, other than the border security officers, about the status that was conferred or not conferred on Mr. Gonzalez-Diaz. I don't know what testimony has to do with it. I mean, Canadian law is Canadian law. Yes, sir. So we don't know. The answer is we don't know. We don't know. What the Canadians do. Okay. And I think in the briefing, both in the government's brief and in the appellant's brief, we made reference to the fact that there was testimony from the BSOs, several BSOs as they went up in rank, but there was no testimony, as I pointed out in my reply brief, with regard to a decision by the Canadian Supreme Court, similar to or on the same ground as Ling May Ma, which we refer to in our brief and which the government relies on. They refer to it as Barber, which is a decision under United States law discussing the status of an individual who had entered the United States, was then paroled into the community until a determination of her status. And once her status was determined, that parole was revoked and she was excluded from the United States, ultimately removed from the United States because she had no status in the United States. And certainly I can see that that's law and has been law since the 1950s in the United States, but there's nothing in the record to indicate what the Canadian Supreme Court said on that same issue. And I think that that's a hole in the government's case, one which we tried to expedite at the time of trial or go through at the time of trial, and one which we urged the Court to consider at least created a factual question for the jury to determine. The trial judge in the case determined that that was not going to be presented to the jury and they were not going to be able to discuss whether or not Mr. Gonzalez-Diaz actually had status, temporary though it may be, in Canada before his return, escorted by and in the custody of Canadian border officials to the United States border. That is just one of the differences between Mr. Gonzalez-Diaz and Messrs. Ambrose Ambrose and Avia Rivera. So are you arguing that because the government didn't establish what Canadian law, how Canadian law would treat him, that he should be deemed, therefore, actually in having an in Canada status so that... Your Honor, I am and I'm not. I mean, I have to concede that Ambrose Ambrose and Avia Rivera, which I will refer to as the flagpole cases, because what really happened in Avia Rivera, which was my case, unfortunately, and Ambrose Ambrose, which was also argued by my office, what happened is that they drove into Canada, were excluded, drove around the flagpole, literally and figuratively, and came back to the United States side where they were arrested for illegal reentry. In this particular case, that's not at all what happened. This is not a flagpole case. This is not controlled by HANDA. You mean they physically went into Canada? They physically went into Canada. That's right, Your Honor. But it was literally 200 yards. Well, I mean, does the distance make a difference? Oh, I don't think distance makes a difference. But it's not dispositive, but it's one of the factors that distinguishes this case from Ambrose Ambrose and Avia Rivera, that they went around the flagpole. Mr. Gonzales-Diaz was at least admitted temporarily for the purpose of determining his asylum claim. And in those cases, it was merely 200 yards. It was a matter of moments, certainly no more than half an hour, if you've ever been there. Well, I mean, the border security officer testified at trial here that it was essentially, he said, essentially like walking to another building for an examination. Well, certainly that's what he testified to, and I understand that. Had this been a larger border port, and the court may not be familiar, but this particular border port is very small. As a matter of fact, this is one of the few that I've seen where the Canadian buildings are actually larger than the United States buildings, and they had to take him to this RCMP facility because they had no detention facilities at the Canadian side of the border. Now, had it been a larger facility, maybe it would have been just taking him next door. But the fact of the matter is, this form and BSO Lonseth, I believe, is the one who issued that form, felt that there had been a claim and they had to determine the legitimacy of that claim. Now, without a determination of the legitimacy of that claim, which, Your Honor, frankly, it never happened, they held him overnight, determined that they were going to exclude him, and sent him back to the United States. Now... Did he ever actually make, in terms, a claim of asylum? I know he said he was afraid. Yes, he never used those words. The officers said, this may be an asylum case. He never used those words. I have to concede that point, certainly. But that's the way it was interpreted, and he did, in fact, make that claim later. Yeah. If this had been a larger border, I don't know, Blaine or someplace, you know, lots of... And they had had a building right there. And they had been able to send him over to the other building, determine, let's say he comes in the morning, and during the course of the day, they figure out, you know, this is not really a legitimate asylum claim, and they send him back in the same way they did here. But he never left the area of the border. It happened in a single day. But as in our actual case, he was always in their custody. Would you get a different answer than the one you're now arguing for? No, Your Honor. And the reason I say that is because forms mean something. And when an officer issues a form allowing one's entry for the purpose of the investigation, it may not confer status on him as a legal alien within the foreign nation, but certainly he has entered for the purpose of that investigation. And when he came back to the United States border, that's what makes this so different from the founding cases that we have here in the Ninth Circuit. And that is why we urge that you distinguish this case from Amber's, distinguish this case from Avila, and find that he did enter, although he was given no legal status. And the hole that is left by not having the Canadian authority, which is the mirror to Lingmay Ma, I believe, at least on this record, indicates that Mr. Gonzalez-Diaz did not or was not found in the United States. Okay. Let's hear from the government. We'll give you a chance to respond. Morning, Your Honors. May it please the Court. Brian Whitaker for the United States. And Mr. Gallagher is correct in that this is not a flagpole case. The reason this is not a flagpole case is because Mr. Gonzalez-Diaz presented himself in Canada, not as Mr. Gonzalez-Diaz, but as Mr. Philip Baca, and he had fraudulent identification documents. That's what started this whole process. Well, you know, lots of asylum seekers have fraudulent documents. That's true. But my point is that it made it more difficult for the Canadians to try to make an admissibility determination. If I was just to go to Canada and I give them the proper documents and I have my passport and say I want to come to Canada, they can make that determination in a short period of time. And that's not what happened in this case. It's because he presented himself in a different name with different documents, and then they found some other documents and they had conflicting names. But what would have happened, in your view, with respect to whether he's reentered and then is or is not found, if we'd had a case in which he'd had a genuine asylum claim, he'd been in Canada for six months while the asylum claim was determined, they deny him asylum, or maybe it takes them two years to deny him asylum, and then they send him back to the United States. What's the answer? Well, I think in order to answer that question, I have to say that in this case, the reason he arrived at the U.S. Port of Entry is because he was excluded by the Canadians. And we had a duty to take him back. And so I guess the answer to your question would be, is if the United States has a duty to take him back because he never received status in Canada, if we have to take him back, then legally he never left here. That would be the answer, because they made a determination he's not admissible, whether it was six. I think time can't be the determining factor. What if they say he's admissible conditionally so that we can evaluate the asylum claim? It takes them, I don't know, six months or two years to evaluate the asylum claim. And then they say, well, you know, it turns out we can't grant you asylum. We're going to take you back to the border. So the words they now use are, we admit you conditionally. I think, I mean, if he received legal status in Canada, that's what Ambrose Ambrose teaches us is that if you have legal status in Canada, then you can't be found in here because you've left. Well, why doesn't he have legal status in Canada then given the form that he was given while they determined? It certainly didn't take them very long, but they thought that he might be an asylum seeker. Right. I guess it depends on the Canadian documentation that they would issue in your scenario. In this scenario, all four border services officers testified that that particular form gave him no legal status in Canada. Now, you bear the burden of proof on this one. Were those border officers competent to testify as to Canadian law? I'm sorry, could you repeat the question? Were those border officers competent to testify as to Canadian law? Yes, they were, Your Honor. Were they lawyers? They were not lawyers. They were those charged by the Canadian government to enforce the Canadian immigration laws, and that's what they do every day, and I think they're competent to testify as to the form that they're issuing. In order to accomplish their job, I mean, they do this every day, and issuing that form in order to move somebody to a different port of entry to conduct the examination is certainly within their scope of knowledge and ability to testify what that form they need to fill out to use in order to accomplish that. Had this been a bigger port of entry, they would have just been able to walk him over to the other building. And I think practically that's what we have to look at here, is that the fact that he had to be moved to a different building because he showed up at a small port of entry, there's got to be some mechanism that Canadians can use to do that. Well, I'm not blaming the Canadians at all. I mean, the Canadians behaved, as far as I can tell, absolutely appropriately. I'm just figuring out what the consequence is for our law. But if you say that coming in with an asylum application, being admitted conditionally for the determination of the legitimacy of the asylum claim, and then at the end of two years the Canadians say, you've got to go back to the United States, that that's a reentry, then I don't see how this case is different. Well, and that's why I realize Mr. Gallagher said we've cited the Barbara case as controlling. It's not controlling. It's an example of how we do it in the United States. Even if an alien is paroled into the United States for six months or two years, they haven't received their status here, and therefore they haven't ever entered the United States. And that's what Barbara tells us, is that they haven't entered. And so you apply that by an analogy in Canada, whether they go there for six months or two years. I think when we start to go down the road of the time, if it's the time that they're there, how do we draw that line? How about if somebody sneaks across the border into Canada, stays for six months, and then comes back? Obviously they've never got any legal status in Canada, and then they're stopped at the border coming into the United States. Have they been found in the United States? I think in that case, well, I don't know how we would know that. In this case we knew. No, I'm assuming you know that. He sneaks across the border. We've got documentation that he was working in Vancouver illegally for six months, and he comes back in and he's stopped at the border. So we know that. Well, if he never received legal status in Canada, then I think that's what Ambrose Ambrose tells us. What if he stays for 20 years and then comes back? And he's illegal the whole time he's in Canada. I think that's the point I was trying to make, Your Honor, is that if we do it based upon time, the time that they're there, I think that highlights the point. How do we make that determination? How do we say, well, 12 hours is enough, two days isn't, or one year isn't, and then they receive. That may cut against you given, and I'm trying to figure out the strength of the other side's argument, given that they gave him a piece of paper that I think, I mean, to me, the sensible interpretation of that piece of paper is he's admitted conditionally  So whether he stays for six months, a year, or overnight, I mean, that's what happened. That was the reason that form was given to him. Yeah, that's right. The form was given to him to question him further. Excuse me. Is that form in the record here? It should be here. Yeah, I think it is, Your Honor. Where is it? You might have to get a little help from your friend. I think it's in the excerpts of record, Your Honor. Yeah, I got that part. Yeah, we couldn't find it. If it's not in there, Your Honor, I'm happy to submit the form. What does it say? What does the form say? The form is called an entry for further examination, and it says that it does say in the form that no legal status is granted to the individual, and they agree to those terms when they sign the form, which Mr. Gonzales-Diaz signed here, and it does say that on the form. I know I have several copies of the form with me right now. It would be helpful if you provided a copy to the court. For whatever reason, we couldn't find it. Maybe that's our fault. I'm happy to provide the court with a copy now if it assists them. The one other fact that I wanted to highlight. Before you do, on the form, what is it that you're? And I apologize. This is a hard copy to read. This is how we got it from the Canadians. Are you reading the front side? It says right here in the middle of the form, it says, Note, I can't read the first word, but authorization to enter Canada does not confer status. And that's what I was highlighting with the court was that they don't have status in Canada. They have not legally entered, and that's consistent with what the four border services officers testified to is that. It depends what you mean by legal. It says entry. So if the key term is enter, it's obviously that he entered. Now, it's obviously entry for a purpose, for further examination or admissibility hearing, but it's not as though they're not allowing him to, quote, enter. I mean, part of my problem is magic words here. I mean, you're in the same fix as we are. I mean, the federal statute that he's being charged under is entirely unilluminated on this question. So the case law is basically making it up. Yeah, and I think the other thing that's highlighted by Ambrose is in this case, if we're not able to charge him as being found in, then essentially he gets a free pass. If he goes into Canada, they bring him back and we have to take him back. As Ambrose highlighted in that case, we couldn't argue that he was attempting to enter under the 1326 statute because he'd say, I didn't have any intent to enter. I wanted to be in Canada, but they kicked me out. And so then we're left with nothing. We can't charge him. Now, in this case, it's a little bit different than Ambrose because- You could charge him with attempted entry. I think under attempted entry, we have to show a proven intent that he intended to enter. And so in order to- Well, you could let him go and pick him up in a couple of days. If we can find him, we'd have to be out of official restraint. So we couldn't monitor him. We'd have to go mix it with the population. I'm sympathetic with your problem, but this one's just kind of a puzzler. And if I make one other highlight point, in this case there was testimony that Mr. Gonzales-Diaz was observed coming up to the port of entry before he was ever gone into custody with the Canadians. We had proof and evidence to show that he was out of official restraint just moments before he crossed over into Canada. And the jury could infer and convict him based upon being found in from that previous offense before this Canadian stuff ever even happened. Was that argued to the jury? I believe that was my closing argument, Your Honor. In fact, I do remember-I remember that I made that argument to the jury, that I said even if he was entered into Canada, it doesn't matter because he was-Border Service Officer Reyndell testified that he saw him driving his car in Montana before he ever crossed over the survey line and was physically in Canada. And the jury convicted him for the passport fraud application, the misuse of a social security number. They'd already determined that he was in Montana. They made that determination on the other counts of conviction. They knew and they made that determination he was in the United States. And the finding is important in that it ends the continuing offense. And he was charged with also indicted for being found in? Yes. So all the words of the statute were included in the indictment? He was charged in the indictment with being found in the United States. That's correct. And being found in implies entry, but it doesn't have to have been the entry here in Canada. It was some earlier entry. Yeah. In his statement, he admitted he entered the United States in April of 2009, which was played for the jury. So they knew he was here. So your charge was not illegal entry. Your charge was being found in. That's correct. That's correct. And you're arguing he was or wasn't under official restraint? He was not under official restraint because he entered in April of 2009, mixed among the population, worked in Montana at Glacier Stone Supply, applied for a fraudulent passport. I was just trying to understand. What did you argue that the jury says? I argued both, Your Honor. But what's the argument? I just want to make sure I'm getting your point. Okay. We argued that he was found in the United States prior to entering Canada and that the finding, the actual official finding, the end of that continuing offense of being found in the United States concluded after he'd been into Canada and came back to the United States and the immigration authorities completed their processing of him. I see. So your argument is we got him as found in either before he left or after he returned. That's correct. That's correct. Based on the border security officer's testimony that he saw him driving up to the border. That's correct. That's correct. He was driving up to the border. He also had been in Montana on the other counts of conviction, which the jury convicted him for. So they had also found he was in Montana in the United States prior to driving into Canada. That's interesting. So why in the world do we have that decision from our panel in the Army's Army's case when it was so easy to prosecute him? If it's a flagpole case, obviously somebody saw him drive around the flagpole. Yeah, I don't remember the facts. I don't remember if we had that testimony in Ambry's Ambry's. I don't remember that. That wasn't my case. Okay. Thanks. Thank you, Your Honor. Response? Your Honor, I know I have no time. No, you've got as much time as you need to make sure we understand the case. I'm just going to be as brief as I possibly can. With my great respect for the Border Patrol officers on both sides of the border, I don't think that Border Patrol officers in Canada have the authority to determine, as did Lien-Mei Ma, what the law of Canada is as far as entry is concerned. What do we do with the argument we heard here at the very end, though, that there was testimony that they saw him in the United States before he went to Canada? Your Honor. And that then is an alternative ground upon which the jury could have found him. It certainly is an alternative ground. But I turn to those cases in this circuit, which indicate that there has to be a convergence of the time that he is discovered and the time that he is arrested for being found in the United States. I'm not saying that the period of time that he spent in the United States, whatever that may be, whether it's April of 2009 or when he was in Kalispell, if he was in Kalispell, or any of those times. Well, the argument is I see different. Found in is different from having been seen in. Exactly. He has to be discovered by the authorities. Thank you very much. Thank you. Okay. Thank you. Both sides. Interesting and somewhat tricky case. United States v. Gonzales-Diaz now submitted for decision. The next case on the argument calendar this morning, Markell v. Kaiser Foundation Health Fund.
judges: Jones, Fletcher W. , Fisher